CHARLES E. MARSH II AND LORETTA MARSH, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6126–77.　　Filed November 26, 1979.

*J. W. Bullion* and *Emily A. Parker*, for the petitioners.
*Mark D. Petersen*, for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1970 ...... | $14,247.67 | 1973 ...... | $23,292.45 |
| 1971 ...... | [1]22.70 | 1974 ...... | 71,680.77 |

On brief, respondent claims revised deficiences as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1970 ...... | $12,316.34 | 1973 ...... | --- |
| 1971 ...... | [1]22.70 | 1974 ...... | $95,075.78 |

[1]The deficiency for 1971 is not clearly explained. We assume it also results from the elimination of a net operating loss carryback from 1973 and that resolution of the issue for 1973 will also resolve the deficiency for 1971.

The deficiency for 1970 and 1974 is the result of respondent's increase in taxable income for 1973 and the concomitant decrease in the net operating loss for 1973 available to be carried back to 1970 and forward to 1974.[1] The facts and issues discussed relate primarily to the years 1973 and 1974.

Due to concessions the issues remaining for resolution are:

(1) Whether petitioners are in receipt of income by virtue of receiving certain interest-free advances during the years 1973 and 1974; and

(2) If petitioners are in receipt of income during the years in issue, are they entitled to an offsetting deduction under section 163, I.R.C. 1954.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by reference.

Charles E. Marsh II (Marsh) and Loretta Marsh, the petitioners herein, are husband and wife and reside in Midland, Tex. For the calendar years 1970, 1971, 1973, and 1974, petitioners timely filed joint Federal income tax returns on the cash basis with the Internal Revenue Service, Southwest Region, through the Internal Revenue Center at Austin, Tex.

During the years in issue, Marsh was an independent oil and gas operator and president of Mallard Exploration, Inc. (Mallard), a Texas corporation having its principal place of business in Midland, Tex. Mallard was also principally involved in the oil and gas business.

During June and July 1971, Mallard acquired approximately 200 undivided interests in certain oil and gas leases covering acreage located in sections 1, 2, 3, 4, 9, 10, 11, 12, and 13, Township–1–North, Range–7–East, Escambia County, Ala., principally through the execution of three farmout agreements with Humble Oil & Refining Co., Louisiana Land & Exploration Co., and Chevron Oil Co.

---

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise indicated.

Under the terms of the farmout agreements, Mallard was required to drill three test wells at its sole risk and expense in order to earn its interest in the oil and gas leases.

In addition to the drilling of the test wells, Mallard was presented with other operational problems relating to its continuing ownership of the leases. The problems it encountered were threefold: (1) The primary term of certain leases would terminate within 1 or 2 years; (2) the primary term of other leases had already expired and Mallard held these leases only because of "continuous drilling clauses," which meant Mallard could retain ownership in these leases only by drilling new wells within 90 days after completion of drilling a previous well; and (3) some of the wells were subject to a "no shut-in gas clause," which means the leases could only be held beyond the primary term by the production and marketing of gas.

On July 26, 1971, Marsh acquired from Mallard a 10-percent undivided interest in Mallard's interest in the oil and gas leases. At the same time, several other individuals, corporations, and trusts acquired from Mallard various undivided interests in the leases. Mallard retained a 10-percent interest in the leases. (Mallard and those who acquired their interest in the leases from Mallard, including Marsh, are hereinafter sometimes collectively referred to as the Mallard group or the owners.)

Between August 17, 1971, and September 12, 1972, the Mallard group drilled three test wells on these leases, and all three wells were completed as commercially productive natural gas wells. The drilling of these wells proved the existence of substantial natural gas reserves, and the gas field which was discovered became known as the Big Escambia Creek Field (field).

The gas produced from the field contained sulphur, carbon dioxide, and condensate (high gravity oil) and other hydrocarbons. In order to market the gas, it was necessary to construct gathering lines and a treating facility to remove the sulphur, carbon dioxide, and liquids from the natural gas.

Because of the continuous drilling clauses and the no shut-in gas clauses, the Mallard group determined that it would need a substantial amount of money in a relatively short period of time to finance the building of the treatment facility and to drill

additional wells. The Mallard group estimated the amount needed to be approximately $12.8 million.

With the exception of two individuals who represented a 12½-percent interest in the Mallard group, the other members did not have the resources to fund their share of the cost of development. It therefore became apparent that outside financing was necessary for the success of the venture.

The Mallard group initially approached a large number of banks, insurance companies, and intrastate transmission companies[3] in an attempt to raise the needed funds, but were unable to obtain commitments in a sufficient amount to pay for the cost of the development.

Due to the fact that certain leases would terminate quickly, the Mallard group relunctantly entered into negotiations with various interstate transmission companies, and, on October 16, 1972, the Mallard group entered into a letter agreement with Southern Natural Gas Co. (Southern), a public utility company subject to regulation by the Federal Power Commissioner (FPC), whereby Southern and the Mallard group agreed to enter into, within 90 days, a gas purchase contract, an advance payment agreement, and an agreement to purchase condensate and other liquid hydrocarbons removed from the gas produced from the field. This letter agreement was finalized into the above-named agreements on December 1, 1972.

Under the terms of the Gas Purchase Contract (GPC) between Southern and the Mallard group, Southern agreed to purchase, and the Mallard group agreed to sell to Southern, all gas produced from the field for a period of 20 years. Southern agreed to pay $0.55 per 1 million BTUs for the initial 2 years of the contract, with escalating prices thereafter. The price of $0.55 per 1 million BTUs was the highest price the parties believed the FPC would approve for sales of gas from the field. The contract provided that it was subject to cancellation in the event the FPC did not approve this price.

Under the terms of the GPC, the Mallard group agreed to drill additional wells, install gathering lines, and construct a treating facility in order to produce, clean, and deliver the gas to

---

[3]Initially, intrastate transmission companies were approached rather than interstate transmission companies because, as a part of any loan, the Mallard group would be required to sell its gas to the transmission companies. Due to the absence of Federal regulation, intrastate transmission companies could pay about three times as much for the gas as would an interstate transmission company.

Southern. Southern also committed itself to construct the facilities necessary to receive deliveries of gas. In the event that Southern did not obtain approval by the FPC to construct the necessary facilities, either the Mallard group or Southern had the right to cancel the GPC. In addition, the Mallard group had the right to cancel the GPC if (1) on January 1, 1974, Southern had not constructed the facilities needed to accept deliveries and the Mallard group was capable of delivering gas as required under the GPC; and (2) on October 15, 1974, Southern was not in the process of construction or had not completed construction of the facilities necessary to accept deliveries of gas from the field.

Simultaneously with the execution of the GPC, Southern and the Mallard group entered into an Advance Payment Agreement (APA). Under the terms of the APA, Southern agreed to advance to the Mallard group a maximum of $12.8 million, in installments, determined on the basis of $0.15 per million BTUs of gas proved by drilling in the field. It was necessary for Southern to make the advance payments in order for the Mallard group to develop and produce the natural gas reserves in the field and in order to induce the Mallard group to enter into the GPC.

The APA further provided that (except in the event of termination of the GPC or the APA), the funds advanced would be repaid in full by the Mallard group, without interest, in 54 equal monthly installments, the first installment commencing the sixth month immediately following the month during which deliveries of natural gas commenced under the GPC. The provision providing that the principal was to be paid back interest free was to induce Mallard to enter into the GPC.

If the Mallard group exercised their right to terminate the GPC, they agreed to repay the advances to Southern in 36 equal monthly installments commencing 12 months after termination of the GPC, including interest thereon computed at the Chase Manhattan Bank's prime commercial rate. In the event that Southern exercised its right to terminate the GPC, however, the Mallard group was obligated to repay the advances under identical terms but without interest. Southern did not require the Mallard group to execute a note covering the amount advanced under the APA, nor was the Mallard group required to secure the advances.

Simultaneously with the execution of the GPC and the APA,

the Mallard group also entered into an option agreement with Southern under which the Mallard group granted Southern an option to purchase the condensate and other liquid hydrocarbons removed from the gas produced from the field.

At the time Southern and the Mallard group negotiated the GPC, the APA, and the option agreement, and through the years in issue, Southern was a publicly traded company. None of the members of the Mallard group owned any stock in Southern, nor did Southern own any interest in the Mallard group. All the dealings between the parties were at arm's length.

At the time of the execution of the agreements with Southern, the members of the Mallard group also entered into two agreements among themselves. First, all the members of the group entered into an agreement in which they designated Mallard as the operator of the field on their behalf. Secondly, the members (except for two members who were to receive advances directly), entered into a trust agreement designating Marsh and the First National Bank of Midland as cotrustees to disburse the advances received by Mallard from Southern. Mallard, as operator of the field, was to receive the advances directly from Southern and was to pay the advances to the cotrustees and the two nonparticipating members. The purpose of the trust agreement was to assure that the advances would be used to pay for past and future expenditures for drilling, construction of the treating facilities, and the processing and marketing of gas.

In November 1973, the FPC tentatively decided to authorize the sale of gas from the field at a rate of $0.50 per 1 million BTUs. The price tentatively authorized by the FPC was $0.05 less than the price provided under the GPC with Southern. Furthermore, as of January 1, 1974, Southern had not obtained authorization from the FPC to construct the facilities required under the GPC. Although the right to cancel the GPC matured, neither party exercised that right. The Mallard group did not cancel the GPC at that time because they did not have the resources to repay the advances over the 36-month period as required under the APA.

As a result of the FPC's tentative approval of a price of only $0.50 per million BTUs, the parties renegotiated certain provisions of the APA. The APA was amended to provide repayment of the advances in a lump sum without interest rather than installments. However, in the event the Mallard group terminat-

ed, the original APA provisions applied. The APA, as amended, required repayment on or before the 25th day of the 60th month immediately following the month during which deliveries of natural gas commenced. In additon, the parties agreed to terminate the option agreement relating to the purchase of the condensate.

In order to assure repayment of the advances made by Southern, the APA, as amended, also required the Mallard group to establish an escrow account or accounts and to pay into such account, on the 25th day of each month, one fifty-fourth of the total advances made by Southern for a period of 54 consecutive months, commencing the sixth month immediately following the month in which the deliveries of natural gas to Southern commenced. All income from the escrow account would be payable to the members of the Mallard group. This escrow arrangement was subsequently entered into by all members of the Mallard group with the exception of the two members who received advances directly.

Eventually the FPC approved the full price of $0.55 per million BTUs as provided under the GPC. Nevertheless, the amended APA and the escrow agreement remained in force.

Pursuant to the APA, Marsh received the following payments from Southern through Mallard:

| Date of payment | Amount | Totals |
|---|---|---|
| 12/18/72 | $253,164.30 | |
| 12/21/72 | 46,835.70 | $300,000.00 |
| 1/15/73 | 285,000.00 | |
| 2/15/73 | 463,790.05 | |
| 2/15/73 | 59,668.95 | |
| 5/15/73 | 149,677.78 | |
| 7/15/73 | 21,683.22 | 979,820.00 |
| 3/12/74 | 48,586.37 | |
| 5/15/74 | 128,625.26 | |
| 8/13/74 | [4](139,129.39) | 38,082.24 |
| Total payments received | | 1,317,902.24 |

All of the advances received by Marsh, as described above, were

---

[4]To reimburse Southern for an overpayment.

received by the trustees and held and disbursed by the trustees under the terms of the trust agreement.

Effective March 1, 1974, Marsh sold one-half of his 10-percent interest in the field to W. R. Grace & Co. (Grace), including one-half of his interest in the funds held under the trust agreement. As part of the consideration, Grace agreed to assume liability for repayment of one-half of the advances received by Marsh pursuant to the APA. In reporting the gain recognized upon the sale, petitioners treated the obligation to repay the advances as part of the proceeds of the sale.

On or about June 10, 1974, the Mallard group commenced delivery of natural gas from the field to Southern pursuant to the GPC. Pursuant to the terms of the APA, as amended, and the escrow agreement, Marsh and certain other members of the Mallard group made the first payment into the escrow account on December 25, 1974, and thereafter have continued to make such payments on or before the 25th day of each month. The first payment made by Marsh was in the amount of $12,557.25, and each payment thereafter has been in the amount of $12,557.07. As of December 27, 1977, Marsh had paid a total of $464,611.77 into escrow accounts.

The petitioners have received interest income with respect to the escrow accounts held by the escrow agent through December 31, 1977, as follows:

| Calendar year | Interest received |
|---|---|
| 1975 | $1,947.65 |
| 1976 | 12,477.67 |
| 1977 | 23,192.34 |
| Total | [5]37,617.62 |

Petitioners included this interest income from the escrow accounts in their taxable income for the years 1975, 1976, and 1977, respectively.

Except for the interest income received with respect to the escrow accounts and included in taxable income, petitioners did not include any amount in income with respect to receipt of the advances from Southern pursuant to the APA.

At no time during the years in issue did petitioners own an

[5]This figure was stipulated by the parties, but it appears to be in error.

interest in any obligations, the interest on which was exempt from taxes.

In the course of negotiating the APA, neither Southern nor the Mallard group requested or discussed the payment of interest with respect to the funds to be advanced thereunder, except for the interest to be paid by the Mallard group in the event they exercised their right to terminate the GPC and APA. So long as the GPC remained in effect, Southern was authorized by FPC rulings to include in its rate base a factor of 10.8 percent of the entire advance to cover the costs of the advance until the Mallard group repaid the loan. In the event of termination of the GPC by the Mallard group, however, Southern was required to remove this factor from the rate base; therefore, Southern required the Mallard group to pay interest in that event.

At the time the notice of deficiency was issued, respondent's position was that petitioners had received additional income from the interest-free use of the funds received from Southern. The amount of additional income received was deemed realized in the years that the Mallard group was in actual receipt of the advances and was determined by applying an interest rate equal to the prime rate plus 1 percent to the amount of advances in question for the entire period that the advances were subject to petitioner's interest-free use.

Respondent's position on brief is that the amount of income received should be measured by applying the above interest factor to the daily balance outstanding. It has been stipulated that for the purposes of this case, an interest factor of prime plus 1 percent, applied to the daily balance outstanding, is the correct measure of any economic benefit inuring to petitioners from the interest-free use of the funds advanced.

OPINION

The first issue for our consideration is whether petitioners are in receipt of taxable income derived from the interest-free use of the funds advanced by Southern under the APA. Respondent contends that since the funds were advanced interest-free in consideration for the GPC and for the natural gas that would ultimately be delivered by the Mallard group pursuant to that contract, petitioners are clearly in receipt of an economic benefit, and such benefit is required to be included in gross income. Respondent would measure the economic benefit by the

amount of interest petitioners would have had to pay had they borrowed the amount of the advances from commercial lending institutions. Petitioners state that the resolution of this issue is controlled by our decision in *Dean v. Commissioner*, 35 T.C. 1083 (1961), where we held under similar circumstances that "an interest-free loan results in no taxable gain to the borrower." (35 T.C. at 1090.) We agree with petitioners.

Initially, respondent recognizes the applicability of *Dean* to the facts in issue, but urges that *Dean* was wrongly decided and should now be overruled by us.

Since the briefs in the instant case were filed, we have had three occasions to review and consider the correctness of our holding in *Dean*. See *Greenspun v. Commissioner*, 72 T.C. 931 (1979); *Zager v. Commissioner*, 72 T.C. 1009 (1979); *Creel v. Commissioner*, 72 T.C. 1173 (1979). For the reasons stated in the above cases, we adhere to our views as expressed in *Dean*.[6]

Respondent attempts to distinguish *Dean* factually on the basis that this loan was negotiated by two unrelated parties and was intended to provide additional consideration for a larger transaction, e.g., the sale of natural gas. To be sure, this represents a different set of circumstances than we encountered in *Dean*. However, we are convinced that the reasoning and rationale in *Dean* apply equally in the instant case.

This view is clearly consistent with our recently decided opinion in *Greenspun v. Commissioner*, *supra*, where we found that no taxable income was realized by the borrower on the receipt of a loan, with a favorable rate of interest, even as a quid pro quo for services to be rendered to an unrelated party. (72 T.C. at 946.) The rationale of our holding in *Greenspun* was to place taxpayers who received low- or no-interest loans on a parity with taxpayers who received interest-bearing loans accompanied by additional consideration equal to the interest charged. We found the taxpayers in both these situations to be "economically speaking" in the same situation, and concluded that it is reasonable to assume that the tax consequences should follow the economic realities of the situation.

Accordingly, we hold that no taxable income resulted to petitioners from the interest-free advances in the years in issue.

---

[6]See also *Martin v. Commissioner*, T.C. Memo. 1979–469, decided this same day.

Since the parties suggested that this was a test case for this type of transaction, we find it appropriate to discuss briefly some of the arguments in light of the facts of this case.

Respondent argues that having cash readily available is an economic benefit because the owner is entitled to demand and receive interest as a condition of lending such capital to another "or investing his capital in some other income-producing venture."[7] Petitioners' response, with which we agree, is that the fact that the owner of capital is entitled to interest on a loan does not mean that he must or actually does receive interest on money loaned. The business transaction here involved was arrived at by arm's-length bargaining between two entirely unrelated parties, each of whom had something the other wanted. Petitioner needed cash and Southern wanted the gas produced by petitioner. They agreed on the terms upon which the exchange would be made. Southern agreed to provide petitioner with the needed cash interest free as long as petitioner sold all of his gas to Southern. Southern received a return on its capital advanced to petitioner by being able to include in its rate base 10.8 percent of the funds advanced. There was no discussion of interest except in the event petitioner canceled the GPC. Petitioner used the money advanced to produce the gas which he sold to Southern. The only economic benefit he received as a result of the advances was being able to produce and sell gas to Southern at $0.55 per million BTUs, all of which he included in his gross income for tax purposes. Neither party intended the unpaid interest to be compensation to petitioner for services rendered or for gas sold or for anything tangible that has been suggested. We are of the opinion that in this transaction the tax implications should be determined from the agreement as made by the parties.[8] See *Frank Lyon Co. v. United States*, 435 U.S. 561, 583 (1978).

Respondent points to section 61(a) which defines gross income as "all income from whatever source derived" and to *Commissioner v. LoBue*, 351 U.S. 243 (1956), rehearing denied 352 U.S. 859 (1956), and other cases which have interpreted that section to mean that Congress intended to tax all instances of gain

---

[7] Perhaps respondent meant "instead" of investing his money in some other income-producing venture. The return on capital "invested" is usually in the form of profit, gain, or dividends.

[8] We wonder whether respondent would allow petitioner to include the amount of this esoteric economic benefit in his cost of goods sold.

regardless of the form, unless specifically excluded. Petitioners correctly point out that the courts have consistently held that not every economic benefit constitutes income. See *Helvering v. Horst*, 311 U.S. 112 (1940); *Palmer v. Commissioner*, 302 U.S. 63 (1937); *Eisner v. Macomber*, 252 U.S. 189 (1920). An economic benefit is not usually considered income until it is realized. Here, the alleged economic benefit is the use of money without payment of interest. Respondent disclaims that the benefit is interest income, but he puts no label on it. We agree that a borrower does not receive interest income, but we believe that is what respondent is, in reality, attempting to charge to petitioners. Here there is no gain resulting from an exchange of property, payment of indebtedness, relief from liability, or other profit realized from the completion of a transaction, to paraphrase from *Helvering v. Bruun*, 309 U.S. 461 (1940). And if, in fact, respondent is attempting to include in petitioners' income imputed interest, we concluded in *Dean* that petitioners would be entitled to an offsetting deduction for imputed interest paid.

Respondent also suggests that the Federal Power Commission, in allowing a percentage of these interest-free advance payments to be included in Southern's rate base,[9] intended them to be a supplement to the interstate rate petitioner could receive for his gas. This is too far fetched for us to accept. Southern realized a benefit from including a percentage of the advances in its rate base, but respondent has pointed to no benefit petitioner received as a result thereof. Furthermore, petitioner was required to repay the advances in full.

We find no reason to deviate from our reasoning and rationale expressed in *Dean* and *Greenspun* in this transaction.

Our conclusion on the first issue makes it unnecessary for us to consider whether petitioners are entitled to an interest deduction under section 163.

Because of other adjustments conceded,

*Decision will be entered under Rule 155.*

---

[9]This would suggest that the FPC considered the tax-free advances to be a justifiable additional cost to Southern rather than a supplement to the price petitioner received for the gas sold to Southern. Under the agreement of the parties, Southern was to absorb this cost. Petitioner would realize no economic benefit unless he used the advances for something other than the production of gas he sold to Southern at a fixed rate, which he included in income.