HERMAN M. AND BARBARA J. GREENSPUN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4602–73.    Filed August 28, 1979.

932

*Edward P. Morgan* and *Michael H. Singer,* for the petitioners.
*Dennis C. DeBerry* and *Charles S. Triplett,* for the respondent.

## OPINION

FAY, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 1967 | $469,613.77 |
| 1969 | 1,157,956.19 |

We have been asked to decide the extent to which, if any, petitioners realized income subject to taxation upon their receipt of a loan in the amount of $4 million at 3-percent interest for a period of years.

All of the facts have been stipulated and are so found.

At the time of filing their petition herein, Herman M. and Barbara J. Greenspun, husband and wife, resided in Las Vegas, Nev.

Since 1950, petitioner Herman M. Greenspun (hereinafter petitioner) has been the editor and publisher of the Las Vegas Sun (Sun), a Las Vegas daily newspaper, which he founded. At all times relevant herein, ownership of the newspaper was held by Las Vegas Sun, Inc., a Nevada corporation, more than 80 percent of the outstanding stock of which was owned directly and constructively by petitioner.

In addition to his interest in the newspaper, petitioner owned

the Paradise Valley Country Club (PVCC), approximately 2,000 acres of vacant land in and around PVCC, and together with Las Vegas Sun, Inc., all of the stock of Las Vegas Television, Inc., licensee of KLAS-TV, Channel 8, in Las Vegas (KLAS-TV).

In the latter part of November 1966, Howard R. Hughes (Hughes) came to Las Vegas where he resided until sometime in 1970. Petitioner first made Hughes' acquaintance in the late 1940's when petitioner was employed at the Flamingo Hotel in Las Vegas. Since that time, he followed Hughes' career until Hughes' death in 1976.

When Hughes moved to Las Vegas in 1966, he took up residency in the penthouse at the Desert Inn Hotel and was never seen or heard from by anyone other than his aides, and an occasional telephone call to his officers and agents. It was at this time that he renewed his friendship with petitioner. Hughes valued petitioner's opinion and advice to the extent of having a private telephone installed in petitioner's home so that Robert Maheu (Maheu), an "independent contractor" employed by Hughes and Hughes Tool Co. (Toolco), and who acted as Hughes' "alter ego," could contact him at any time when petitioner was not in his office. Although his acquaintance with Hughes predated the time when Hughes apparently became a "recluse," petitioner never spoke directly to Hughes during Hughes' entire residency in Las Vegas from 1966 to 1970.

Following his arrival in late 1966, Hughes undertook to make additional substantial investments in and around Las Vegas and in Nevada, generally, for himself as well as for Toolco. Previously, Hughes had made investments in substantial acres of underdeveloped real property in the Las Vegas area.

In the first half of 1967, Hughes was aware that petitioner, as a result of a disastrous fire at the Sun in 1963, was in need of cash.[1] It was about this time that Hughes expressed an interest in purchasing PVCC as an alternate site for the annual Tournament of Champions Golf Event.[2] In addition, Hughes was also interested in purchasing from petitioner approximately

---

[1] As a consequence of the 1963 fire, petitioner had the newspaper printed in Los Angeles, Calif., and flown each day to Las Vegas, resulting in a substantial deficit to the Sun.

[2] In prior years, the event had been held at the Desert Inn Country Club but was canceled by Hughes following the purchase of the Desert Inn Hotel by Toolco around April 1967.

2,000 acres of vacant land in and around PVCC, the assets of KLAS-TV, and the Sun.[3]

While petitioner advised Hughes that under no circumstances would he agree to sell his interest in the Sun, he did indicate a willingness to sell the assets of PVCC and the surrounding acreage to Hughes. However, petitioner refused to remove the property from the market unless and until Hughes executed a commitment to purchase the property which Hughes was then unwilling to do. No agreement or understanding was reached between petitioner and Hughes in 1967 relative to the sale of PVCC, except that petitioner, acting under the belief that at a later date Hughes might desire to purchase the golf course and as much acreage surrounding the golf course as possible, proceeded to purchase an option on approximately 1,120 surrounding acres known as the "John Tom Ross Property."

About this time in 1967, petitioner also had discussions with both Maheu and Roy Crawford (Crawford), another of Hughes' close employees and a member of a small group that had personal contact with Hughes, regarding the possibility of a loan from Hughes. During the course of their discussions, Maheu told petitioner that he had recommended to Hughes a loan of $3 million at 6-percent interest. However, at some point, Crawford advised petitioner that Hughes did not wish to charge any interest because, as petitioner understood it, of Hughes' passive income problems which would have a bearing on Toolco's tax liability. Later, petitioner was told by Richard Gray (Gray), Hughes' and Toolco's attorney-in-fact, that some interest would have to be charged because the Internal Revenue Service might otherwise question the transaction. In this connection, Gray told petitioner that in his opinion the lowest permissible rate would be 3 to 4 percent, whereupon petitioner agreed to an interest rate of 3 percent.

Although apparently not disclosed to petitioner, Hughes was interested in cultivating the friendship of petitioner from whom Toolco would have a friendly press and a strong ally if problems developed. As Maheu put it, Hughes "wanted [petitioner] perpetually beholden."

During approximately the same time period that petitioner

[3]Prior to the years in issue, petitioner had not participated in any business transactions with Hughes, Toolco, or any other corporation or entity controlled by Hughes.

and Toolco were negotiating for the loan, discussions also were held concerning Toolco's purchase of KLAS-TV. These discussions culminated in an agreement between petitioner, Las Vegas Sun, Inc., and Toolco for the purchase and sale of the television station on August 5, 1967, subject to the approval of the Federal Communications Commission. The consideration for the sale of the television station consisted of a cash payment plus the assumption of certain liabilities of the corporate licensee as follows:

| | |
|---|---|
| Cash payment by Hughes to petitioner .............................. | $3,645,148 |
| Net liabilities in excess of assets assumed by Hughes ....... | 400,217 |
| Total consideration paid by Hughes for fixed assets, licenses, network affiliation, and goodwill of KLAS-TV ........... | 4,045,365 |

One or 2 days prior to August 5, 1967, the date of the agreement for the sale of KLAS-TV, Toolco, at the direction of Hughes, issued a commitment letter to petitioner for a $4 million loan. Additionally, and at the same time, Toolco deposited with petitioner the sum of $500,000 as advance advertising in the Sun. From Toolco's standpoint, Gray stated that the issuance of the loan commitment letter and the $500,000 advance advertising fee were intended to influence petitioner, as stockholder of Las Vegas Television, Inc., to consent to the sale of its corporate assets.[4] However, petitioner stated that he considered the sale of the television station and the loan as separate and independent transactions. In any event, to obviate the impression that the loan and the sale of KLAS-TV were linked together, the commitment letter was backdated several months to May 15, 1967, at the request of petitioner's accountant.[5]

The commitment letter stated that a $4 million 3-percent loan

---

[4] In its application to the FCC for approval of the sale and transfer of the television license, Toolco affirmatively acknowledged under oath that the only consideration it paid for KLAS-TV was $3,645,148 in cash together with the assumption of $400,217 in liabilities.

[5] In negotiating the sale of KLAS-TV, petitioner relied heavily on the advice of his accountant, who is experienced in the operations, management, and valuation of radio and television broadcasting stations. He advised petitioner that on the basis of accepted standards of valuing TV stations and a comparison with the sale of other TV stations, the purchase price offered by Toolco for KLAS-TV exceeded the value of the station by at least $500,000 and that petitioner should accept the offer.

for 8 years would be made, secured by (1) a pledge of all the capital stock of PVCC; (2) a pledge of at least 80.085 percent of the capital stock of the Sun; and (3) a deed of trust covering the approximately 2,000 acres of unimproved real estate surrounding PVCC.

On September 20, 1967, the loan proceeds of $4 million were disbursed upon petitioner's execution of a promissory note, a deed of trust covering approximately 2,000 acres in Clark County, Nev., and a collateral pledge agreement covering 95,300 shares of the Sun and 1,516,830 shares of PVCC. Specifically, the proceeds of $4 million were disbursed to the Chicago Title Insurance Co. with instructions that distributions be made as follows: Of the $4 million proceeds, approximately $2 million was to be used to satisfy encumbrances on the real property pledged in the deed of trust, so that Toolco would be able to obtain a first-security position thereon. The remaining proceeds were to be disbursed directly to petitioner. Of this amount, he used approximately $784,000 to acquire, by the exercise of his option, the John Tom Ross real property, and the balance of approximately $1,310,000, was loaned by petitioner to the Sun.

The repayment provisions contained in the promissory note executed by petitioner provided that interest on the unpaid principal, at the rate of 3 percent per annum, was to be made quarterly, and that payments upon the principal were to be made in accordance with the following schedule:

a. $250,000, on the 20th day of September, 1970.
b. $250,000, on the 20th day of September, 1971.
c. $500,000, on the 20th day of September, 1972.
d. $1,000,000, on the 20th day of September, 1973.
e. $1,000,000, on the 20th day of September, 1974.
f. $1,000,000, on the 20th day of September, 1975.

Petitioner has stated he did not believe that the 1967 loan was compensation for past services or future services to be rendered. Rather, he felt that the loan, in part, was made in return for his oral assurance that he would not sell the golf course or surrounding acreage without giving Toolco a reasonable opportunity to negotiate the purchase thereof with him.

Sometime in 1969, discussions were resumed between Toolco and petitioner regarding the purchase of all the assets of PVCC, and approximately 4,000 acres in the vicinity thereof owned by petitioner, including 1,120 acres which he had acquired pursuant

to his exercise of the option he held on the John Tom Ross property.

Eventually an agreement was reached, and, on or about May 20, 1969, Toolco purchased the assets of PVCC for $2,250,000 in cash. Additionally, an agreement of sale was executed by Toolco to purchase for $5,033,467 in cash the real property owned by petitioner and pledged under the deed of trust as security for the promissory note executed in 1967. Further, a 60-day option was granted Toolco by the Greenspun's children's trust to purchase certain real property owned by it for $216,533 payable in cash. Finally, a new promissory note and collateral pledge agreement were executed extending the period for repayment of the $4 million borrowed in 1967 through the year 2004.[6]

This new promissory note, though executed on or about May 20, 1969, was backdated about 8 months to September 27, 1968, as was the collateral pledge agreement. Again, this new note was backdated at the suggestion of petitioner's accountant "so that it would not appear that the new note was additional compensation for the land transaction."

Repayment of the principal and interest payments on the new note were scheduled as follows:

| Date due | Amount |
|---|---|
| For 10 years commencing Sept. 27, 1980 | $100,000 plus accrued interest |
| For 10 years commencing Sept. 27, 1990 | 150,000 plus accrued interest |
| For 5 years commencing Sept. 27, 2000 | 300,000 plus accrued interest |

Prior to July 15, 1969, the designated closing date for the sale of the real property, petitioner was advised Hughes changed his mind and wanted to rescind the whole transaction and would prefer not to consummate the purchase of the real estate if the matter could be amicably resolved with petitioner. However, Hughes did not want to antagonize petitioner inasmuch as he then valued petitioner's goodwill and support. After all, he had a "substantial investment"[7] in petitioner's goodwill and friendship

---

[6]No additional funds were received in 1969 in connection with the modification and extension of the 1967 note and security agreements.

[7]Maheu's characterization.

at that time. In fact, Hughes would have consummated the transaction if petitioner had so insisted.

Petitioner was reluctant to consent to a rescission of the whole deal since the sale of the land was to ultimately provide the funds to pay off the $4 million loan. He finally agreed he would not insist upon closing under the agreement for the purchase of the real estate provided the new 1969 note and the PVCC sale would remain in full force and effect and that, as contemplated by the agreement, the new collateral pledge agreement would be substituted for the 1967 collateral pledge agreement, thereby removing the deed of trust on petitioner's property. Toolco agreed to these terms although the deed of trust was never returned to petitioner and was later recorded by Toolco as a cloud on the title to the land.

Petitioner made all the interest payments required under the 1967 note until it was renegotiated in 1969. From that point in time, petitioner made all the interest payments required by the 1969 note until January 1972, when Toolco refused further interest payments on the ground the 1969 note was void and demanded principal payments due under the time sequence set forth in the 1967 note.

Civil litigation followed by petitioner and Toolco (which later became Summa Corp.) in the District Court, Clark County, Nev., and that court held that the 1969 note was valid and that petitioner's obligations under the 1967 note were extinguished at the time the 1969 note was executed. In addition, the deed of trust executed in 1967 was lifted from petitioner's property.

Throughout the period of Hughes' residence in Las Vegas during 1966 through 1970, petitioner published a number of editorials in the Sun, first welcoming Hughes to Nevada and then generally supporting Toolco's and Hughes' acquisitions of properties in the State.

The first of such editorials appeared in the Sun on December 2, 1966. After describing Hughes as the "world's greatest industrialist" and a "rare individual" whose accomplishments made him a "legend in his own time," the editorial was strongly supportive of his right to privacy.

A March 29, 1967, editorial recited Hughes' proposed University of Nevada Medical School contribution and called him an "exceptional man."

Another editorial published September 10, 1967, supported a

possible SST airport terminus in the Las Vegas area apparently contemplated by Hughes and compared his intellectual capabilities with those of Newton's as a justification for his penchant for solitude.

On November 11, 1967, a statement of Hughes' was prominently and fully set forth to clarify misunderstandings regarding the SST terminus which appeared in a "major Las Vegas newspaper."[8]

Subsequently, on January 19, 1968, petitioner editorialized about the new favorable image of Las Vegas across the country which he attributed largely to Hughes.

On March 15, 1968, petitioner voluntarily appeared before the Nevada Gaming Policy Board to publicly voice his support of Hughes' proposed purchase of two Las Vegas Strip resorts. Petitioner stated that he originally had no intention of appearing at the gaming board meeting but felt obligated to do so to "set the record straight" on a story appearing in another Las Vegas newspaper which apparently opposed Hughes' proposed purchases but which petitioner said was "loaded with inaccuracies and outright distortions."[9] In his statement, the entire text of which was published in the Sun on March 16, 1968, petitioner "told the Nevada Gaming Policy Board that Nevada was becoming respectable in the eyes of the world because of" Hughes. He described Hughes "as a titan of unparalleled stature who had, 'given Las Vegas a new image—a good image.' " Petitioner's position in support of multiple casino ownership by one interest was admittedly contrary to a position he had taken in an earlier appearance before the board. However, petitioner explained that his change of position was motivated by his personal belief that ownership of the hotels by legitimate business entities, such as Toolco, would eliminate the "criminal element" or other undesirables from hotel ownership; and, consequently, corporate ownership would enhance and improve the overall gaming industry, Nevada's prime industry.

Another editorial on October 16, 1968, extolled Hughes for Las Vegas' economic revival, praised the Sahara Invitational Golf

---

[8] Presumably, the Las Vegas newspaper which carried the "misunderstandings" was the Las Vegas Review Journal. On several occasions, petitioner attempted to counteract news articles critical of Hughes which appeared in the Las Vegas Review Journal.

[9] Again, the other Las Vegas newspaper which published the "inaccuracies" and "distortions" about Hughes which petitioner wanted to set straight was apparently the Las Vegas Review Journal. See n. 8 *supra.*

Tournament sponsored by Hughes, Hughes' acquisition of Sports Network, and the condition of the Paradise Valley golf course "acknowledged to be one of the best in the nation."

The Sun on May 22, 1969, favorably reported the "Howard Hughes organization" acquisition of PVCC.

A July 2, 1969, editorial lavishly praised Hughes' acquisition of the economically faltering Landmark Hotel and Casino, extolling the virtue of Hughes and the use of his wealth.

Another September 19, 1969, editorial was highly supportive of Hughes and his acquisitions of organizations in Nevada in defense of implied political criticism by the then Governor of Nevada.

In addition, petitioner assisted Hughes and Toolco in their initial unsuccessful efforts to acquire all the newspaper, radio, and television interests owned by Don Reynolds in Nevada including the Las Vegas Review Journal.

The rate of interest that would have been charged in 1967 by banks for mortgages, bonds, preferred stock, and newly issued bonds for the use of $4 million repayable in 8 years with the risk factors and maturities as contained in the 1967 promissory note on an arm's-length basis would have been not less than 6 percent.

The rate of interest that would have been charged in 1969 by banks for mortgages, bonds, preferred stock, and newly issued bonds for the use of $4 million repayable in 35 years with the risk factors and maturities as contained in the 1969 promissory note on an arm's-length basis would have been not less than 6 percent.

Petitioner in fact during 1967 through 1969 borrowed and loaned moneys at interest rates in excess of 6 percent.

During the years here in issue, no portion of the loan proceeds was invested, partially or wholly, by petitioner in tax-exempt securities nor did petitioner own or carry any partially or wholly tax-exempt securities.

In his statutory notice of deficiency, respondent increased petitioner's taxable income for 1967 in the amount of $701,211, the computation therefor being measured by first computing the annual difference, or savings, between the 3-percent rate charged by Toolco and a 6-percent rate taking into account projected payments of principal. Respondent then totaled the present value of the expected annual savings over the term of

the loan. In that same notice, respondent increased petitioner's 1969 taxable income in the amount of $1,536,156 as the result of the extension, rearrangement, and renewal of the 1967 note by the 1969 note. The same formula was used by respondent to compute the present value of the difference between the 3-percent rate charged and a 6-percent rate for the extended period. Respondent's adjustments were based on his belief that the favorable 3-percent rate charged by Toolco was not a gift, but rather was granted in return for present consideration or future expected consideration.

The ultimate issue for decision is the extent to which, if any, petitioner realized taxable income upon his receipt of a loan of $4 million for a term of years at 3-percent interest.

Respondent's position is that petitioner, as recompense for services rendered or to be rendered, received a valuable asset—the right to the unrestricted use of a substantial sum of money for less than full and adequate payment in money or money's worth. He argues this valuable asset or right represents an economic benefit included within the sweeping definition of gross income under section 61[10] as "all income from whatever source derived."

As support for his position that no taxable income was realized upon his receipt of the loan, petitioner makes several arguments. First, he asserts the admittedly favorable interest rate was not granted in exchange for services rendered or to be rendered. That is, the favorable rate did not represent consideration for a quid pro quo. He maintains that while Hughes may have made the loan with the expectation of some future consideration from petitioner, that fact was not made known to petitioner. He asserts any actions undertaken by him on Hughes' behalf were motivated, not by the loan, but by his sincere belief that the advent of corporate ownership of the Las Vegas "Strip" hotels was in the best interests of the State of Nevada because it would eliminate the "criminal element" from hotel ownership. Thus, by analogizing to several cases involving bargain purchases of property, he concludes so long as no consideration was bargained for in exchange for his receipt of the loan, no taxable income can result. Alternatively, petitioner argues even if the favorable

---

[10]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

interest rate was in consideration of a quid pro quo, under our decision in *Dean v. Commissioner*, 35 T.C. 1083 (1961), as a matter of law, the loan cannot result in taxable income.

(1) The threshold question, therefore, as framed by the parties, is whether the favorable interest rate on the loan was granted to petitioner in exchange for consideration given or to be given. As to this question, after examining all the evidence presented, we agree with respondent and conclude the loan and its favorable terms were intended to compensate petitioner for services which he in fact subsequently rendered, and as an inducement for petitioner's agreement to effect certain property transactions.

In the first place, there is little doubt that Hughes in making the loan to petitioner at 3-percent interest intended to compensate him for future consideration. Shortly after moving to Las Vegas in late 1966, Hughes embarked upon his plan to make substantial investments and acquisitions in and around Las Vegas. Apparently, he believed that sooner or later he might encounter opposition to his acquisitions and to thus offset this expected opposition, he sought to acquire control of a substantial share of the newspaper, radio, and television interests in the Las Vegas area. His obvious plan in this respect was to be in a position in which he could foster a good public image of himself by manipulating a friendly press. To this end, Hughes approached petitioner with an offer to purchase petitioner's newspaper, the Sun, and KLAS-TV, also owned by petitioner.[11] Although willing to sell his interest in KLAS-TV, petitioner told Hughes that under no circumstances would he sell the Sun. It was during this period that Hughes learned petitioner was very much in need of cash. Apparently realizing he could not acquire ownership of the newspaper directly, Hughes believed that for his purposes he could do so indirectly by lending petitioner the cash he needed. At first, Hughes wanted to loan petitioner $4 million interest free. However, it was thought the Internal Revenue Service might question such a transaction and so a 3-percent interest charge was agreed upon—a rate well below the market at that time. Judging from his professional and investment undertakings and accomplishments, petitioner is obviously

---

[11]Hughes also attempted to acquire the newspaper, radio, and television interests owned by another individual in the Las Vegas area.

a shrewd businessman of considerable intelligence and resource-fulness. In view of this, his self-supporting statement that he did not realize Hughes expected a quid pro quo in return for making a term loan of $4 million at no interest or at a small rate of interest is, simply put, not believable and contrary to the evidence in the record.[12]

The objective facts show that Hughes, as consideration for his making a substantial loan at a favorable rate, expected friendly press coverage from petitioner and that is precisely what petitioner provided. On numerous occasions, petitioner published editorials extolling Hughes' virtues and accomplishments. He defended Hughes in the face of criticism from another Las Vegas newspaper and from the then Governor of Nevada. In 1968, he voluntarily appeared before the Nevada Gaming Policy Board to voice his support of Hughes' acquisition of two casinos. This was done despite the fact his position before the board was directly contrary to his prior position of opposing multiple casino ownership.[13]

In addition to the favorable press coverage, we also think the low-interest loan was intended to induce the sale by petitioner to Hughes or Toolco of certain property. In 1967, a few days prior to the signing of the sale agreement conveying the assets of KLAS-TV from petitioner to Toolco, a commitment letter for the $4 million loan at 3-percent interest was issued at Hughes' direction. From Toolco's perspective, the issuance of the loan-commitment letter was intended to influence petitioner to consent to the sale of KLAS-TV. Subsequently, in 1969, 1 or 2 days prior to the sale of PVCC by petitioner to Hughes, the promissory note covering the loan executed by petitioner in 1967 was replaced with a new promissory note extending the term of the loan from 8 years to 35 years. On both occasions, the issuance of the 1967 commitment letter and the execution of the 1969 promissory note, the documents involved were backdated several months at the request of petitioner's representative to negate the impression the granting and extension of the loan represent-

---

[12]Petitioner does not contend the low-interest rate was a product of Hughes' detached and disinterested generosity.

[13]Related to this incident, an attorney and close personal friend of petitioner, who was also an attorney for Toolco, wrote a letter (a stipulated exhibit in this case) to one of Hughes' closest associates in April 1970 in which he described petitioner's reaction to the possible acquisition of another major hotel by Hughes. When considered in the context of the entire record, this letter is strong, if not conclusive, proof that petitioner knew full well of Hughes' reasons for making the loan.

ed additional compensation for the sale transactions which followed shortly thereafter. Petitioner has stated that he considered the loan transaction separate from the sale transactions. In this regard, petitioner notes the price paid for KLAS-TV was fair and reasonable, and that it was stipulated to the FCC the consideration paid included only the cash payment made and the assumption by Toolco of KLAS-TV's liabilities. While these latter few factors favor petitioner's position, considering the totality of the circumstances including petitioner's acumen, the close proximity in time of the loan and sale transactions, the twice backdating of the documents, and Toolco's view of the loan, on balance we do not think petitioner reasonably believed the loan transactions were separate from the sale transactions. Moreover, petitioner has admitted he considered the loan, in part, was made in return for his assurance that he would give Toolco a right of first refusal on any proposed sale of PVCC.

In sum, we think the evidence clearly establishes the low-interest loan was granted petitioner by Hughes for future consideration which petitioner knew or should have known was expected of him and which in fact was rendered.

With respect to this question of whether the low-interest loan was granted in exchange for future consideration, each of the cases cited by petitioner,[14] is factually dissimilar to the instant situation, and, for that reason, we do not think a detailed discussion of each one is necessary. Briefly, the issue in those cases was whether a bargain purchase of property constituted income to the taxpayer-purchaser. The principles used to make this determination were stated in *Husted v. Commissioner*, 47 T.C. 664, 673–674 (1967), as follows:

> To decide whether the petitioner's acquisition of * * * stock constituted the receipt of compensation, we must ascertain whether he acquired such stock at a bargain and, if so, whether the purpose of selling it to him at a bargain was to provide him with compensation.
>
> Ordinarily, a purchase of property does not result in the realization of income. This principle was applied by the Supreme Court in *Palmer v. Commissioner*, 302 U.S. 63 (1937), in which the Court found that the taxpayer was merely a purchaser and, accordingly, his purchase did not result in the receipt of income. Later, however, in *Commissioner v. Smith*, 324 U.S. 177

---

[14] *Pellar v. Commissioner*, 25 T.C. 299 (1955); *Aspegren v. Commissioner*, 51 T.C. 945 (1969); *Hunley v. Commissioner*, T.C. Memo. 1966–66. See also *Commonwealth Title Co. v. Rothensies*, 124 F. Supp. 274 (E.D. Pa. 1954).

(1945), the Supreme Court made it clear that when stock is sold at a bargain for the purpose of compensating someone, such a purchase does constitute the receipt of income. Still later in *Commissioner v. LoBue*, 351 U.S. 243 (1956), the Court held that a bargain sale of stock to an employee because he is an employee is a compensatory sale. The result of these decisions is to leave us with the question of ascertaining whether [the taxpayer] was merely a fortunate or wise purchaser of stock or whether he was allowed to purchase it at a bargain for the purpose of compensating him.

Thus, the relevant factual inquiry in the cases petitioner cites was whether the economic benefit received by the taxpayer represented payment for services rendered. On the facts of those cases, we found that it did not. Here, on the other hand, we have concluded the favorable interest rate was granted petitioner in exchange for consideration to be given, and which, in fact, was so rendered. In view of this, the cases which petitioner relies upon are simply of no help to his position.

(2) Having concluded the favorable interest rate was granted petitioner in exchange for a quid pro quo, we must address petitioner's alternate contention that under the rationale of *Dean v. Commissioner*, 35 T.C. 1083 (1961), as a matter of law, no income was realized by him upon receipt of the loan.[15]

In *Dean*, the taxpayers within a 2-year period had borrowed, without interest, over $2 million from the Nemours Corp. of which they were virtually the sole shareholders. The Commissioner sought to increase their income by the amount of money they would have been required to pay in order to borrow $2 million in an arm's-length transaction. As support for his position, the Commissioner relied on a series of cases holding that the rent-free use of corporate property constitutes a taxable economic benefit to the user.[16]

In rejecting the analogy to these cases, we stated:

These cases bear a superficial resemblance to the present case, but reflection convinces us that they are not in point. In each of them a benefit was conferred upon the stockholder or officer in circumstances such that had the stockholder or officer undertaken to procure the same benefit by an expenditure of money

---

[15]See *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d 862 (3d Cir. 1974); *Saunders v. United States*, 294 F. Supp. 1276 (D. Hawaii 1968); *Suttle v. Commissioner*, T.C. Memo. 1978-393.

[16]*Frueauff v. Commissioner*, 30 B.T.A. 449 (1934); *Reynard Corp. v. Commissioner*, 30 B.T.A. 451 (1934); *Chandler v. Commissioner*, 41 B.T.A. 165 (1940), affd. 119 F.2d 623 (3d Cir. 1941); *Dean v. Commissioner*, 9 T.C. 256 (1947); *Dean v. Commissioner*, 187 F.2d 1019 (3d Cir. 1951), affg. a Memorandum Opinion of this Court; *Rodgers Dairy Co. v. Commissioner*, 14 T.C. 66 (1950).

such expenditure would not have been deductible by him. Here, on the other hand, had petitioners borrowed the funds in question on interest-bearing notes, their payment of interest would have been fully deductible by them under section 163, I.R.C. 1954. Not only would they not be charged with the additional income in controversy herein, but they would have a deduction equal to that very amount. We think this circumstance differentiates the various cases relied upon by the Commissioner, and perhaps explains why he has apparently never taken this position in any prior case. [35 T.C. at 1090.]

In so distinguishing the cases involving rent-free use of corporate property, however, our finding of no taxable income to the taxpayers was not grounded on the imputed interest deduction, but rather was based on the conclusion that "an interest-free loan results in no taxable gain to the borrower." (35 T.C. at 1090.)

Relying on our decision in *Dean*, petitioner argues that since the facts show no part of the funds borrowed by him were used to purchase tax-exempt securities, and since no part of the loan proceeds was utilized in a manner which would have precluded an interest deduction had the interest, in fact, been paid to Hughes, it must follow that no taxable income was realized from the receipt of the loan proceeds. Respondent acknowledges that an issue similar to the one in the instant case was considered in *Dean* and decided adversely against him. However, respondent contends that *Dean* was wrongly decided and should no longer be followed. Briefly, he argues that petitioner received an economic benefit which should be included in his gross income.

For the reasons set forth below, we agree with petitioner and hold that during the years in issue no income subject to taxation was realized from the receipt of the loan proceeds.

In determining whether a loan at a preferential rate of interest constitutes income to the recipient, we begin with section 61 which defines gross income as "all income from whatever source derived," unless otherwise specifically exempted. It has long been held that this definition is to be broadly interpreted. In *Commissioner v. Smith*, 324 U.S. 177, 181 (1945), the Supreme Court, in interpreting the predecessor of section 61, stated: "Section 22(a) of the Revenue Act is broad enough to include in taxable income *any economic or financial benefit* conferred on the employee as compensation, *whatever the form*

*or model by which it is effected.*" (Emphasis added.) See also *Helvering v. Bruun*, 309 U.S. 461 (1940); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955); *General Investors Co. v. Commissioner*, 348 U.S. 434 (1955); H. Rept. 1337, 83d Cong., 2d Sess. A18 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 168 (1954).

On numerous occasions, this broad definition has formed the basis for the conclusion that a shareholder or an employee realizes an economic benefit taxable as income from the use of corporate assets for less than adequate payment in money or money's worth. *Genshaft v. Commissioner*, 64 T.C. 282 (1975) (maintenance of life insurance policies); *International Artists, Ltd. v. Commissioner*, 55 T.C. 94 (1970) (rent-free use of corporate house); *Challenge Manufacturing Co. v. Commissioner*, 37 T.C. 650 (1962) (rent-free use of corporate boat); *United Aniline Co. v. Commissioner*, 316 F.2d 701 (1st Cir. 1963) (corporate payment of yacht expenses); *Walker v. Commissioner*, 362 F.2d 140 (7th Cir. 1966) (rent-free use of corporate house); *Rodgers Dairy Co. v. Commissioner*, 14 T.C. 66 (1950) (rent-free use of corporate automobile); *Dean v. Commissioner*, 9 T.C. 256 (1947) (rent-free use of corporate house); *Frueauff v. Commissioner*, 30 B.T.A. 449 (1934) (rent-free use of corporate apartment).[17]

Undeniably, the use of funds absent a corresponding obligation to pay interest, or to pay interest only at a preferential rate, in most, if not all, cases constitutes as valuable an economic benefit as would any rent-free use of a residence, automobile, or boat. See *Mason v. United States*, 513 F.2d 25 (7th Cir. 1975). Thus, in line with the reasoning of the above cases, it would appear as respondent contends that where, as here, a loan at a favorable rate is granted in exchange for services, the borrower has realized a clear economic benefit taxable as income.

In holding that no income was realized by the taxpayers in *Dean*, however, we reasoned that had the taxpayers borrowed the funds on interest-bearing notes, their payment of interest would have been fully deductible under section 163. Underlying this reasoning was the idea that, economically speaking, an

---

[17]*Beckley v. Commissioner*, T.C. Memo. 1975–37 (use of corporate airplane); *Bardahl Mfg. Co. v. Commissioner*, T.C. Memo. 1960–223 (rent-free use of corporate automobile); *Rosania v. Commissioner*, T.C. Memo. 1956–116 (rent-free use of corporate automobile); *Rethorst v. Commissioner*, T.C. Memo. 1972–222 (rent-free use of house); *Lang Chevrolet Co. v. Commissioner*, T.C. Memo. 1967–212 (use of automobile).

interest-free loan from a corporation to its shareholder or employee is in substance no different from the making of a loan on which interest is charged accompanied by an increase in dividends or compensation in an amount equal to the interest charged. Consequently, to give effect to the economic reality of the situation, we attempted in *Dean* to equalize the tax treatment of the two loan transactions.

To illustrate this point, assume that A, an employee of X Co., received as his only form of compensation an interest-free loan from X Co. in the amount of $20,000 for a period of 1 year. Further assume the prevailing interest rate at the time was 5 percent or $1,000 a year. The economic effect of this transaction is the same as if X Co. had charged A interest at 5 percent on the $20,000 loan, and, at the same time, paid him a salary of $1,000 which A in turn used to pay the interest. Assuming no other facts, in the second hypothetical, A would have gross income from his salary of $1,000 and an interest deduction of $1,000 or taxable income of $0. Consistent with this result, in the first hypothetical involving the interest-free loan, A's taxable income under our holding in *Dean* would be $0.

In relying on *Dean* herein, we are fully aware, as observed by the concurring and dissenting opinions in *Dean*[18] and by several commentators,[19] that the two hypothetical loan transactions will not be taxed the same, leading us in every case to the automatic conclusion that an interest-free loan results in no taxable gain to the borrower. For instance, in not all cases does the payment of interest give rise to a deduction under section 163. The most notable limitation in this regard is found in section 265(2) which prohibits a deduction for interest paid on indebtedness incurred to purchase or carry obligations, the interest income from which is exempt from tax. Failing to give recognition to this fact could

---

[18]*Dean v. Commissioner*, 35 T.C. 1083, 1090, 1091 (1961) (Opper, J., concurring and Bruce, J., dissenting).

[19]S. Surrey, W. Warren, P. McDaniel and H. Ault, Federal Income Taxation, pp. 134–135 (1972); R. Keller, "The Tax Consequences of Interest-Free Loans from Corporations to Shareholders and from Employers to Employees," 19 B.C. Ind. & Comm. L. Rev. 231 (1978); S. Duhl & S. Fine, "New Case Allowing Interest Deduction calls for Reappraisal of No-Interest Loans," 44 J. Tax. 34 (1976); D. Herskovitz, "Techniques Available to Shield the High Income of the 'Superstar' " 34 J. Tax. 270 (1971); J. O'Hare, "The Taxation of Interest-Free Loans," 27 Vand. L. Rev. 1085 (1974); B. Schlifke, "Taxing as Income the Receipt of Interest-Free Loans," 44 Taxes 544 (1966); J. Sneed, "Unlabeled Income and Section 483," 17th U. So. Cal. Tax Inst. 643 (1965); F. Burke, "Interest-Free Loans—A Valuable Family Tax Planning Tool?" 48 Taxes 137 (1970); B. Mitchell, "Interest-Free Loans: Opportunities for Tax Planning," 65 A.B.A.J. 634 (April 1979); J. Benefield, "Gross Income—Interest-Free Loans," 13 Mercer L. Rev. 421 (1962).

possibly create a situation which would unfairly favor the making of interest-free loans.

For example, using the same basic set of facts in the above hypotheticals, assume that in both situations A invests the proceeds of the $20,000 loan in securities yielding $1,000 of interest income per annum which is exempt from taxation under section 103. In the first hypothetical involving the interest-free loan by X Co., under *Dean*, A will have no taxable income at year's end. In the second hypothetical where A is paid a salary of $1,000 and charged $1,000 of interest on the loan, A would have $1,000 of gross income but would be unable to deduct his payment of the interest by virtue of section 265(2). The end result is that X Co. in granting the loan interest-free has enabled A to effectively convert $1,000 of taxable compensation into $1,000 of tax-exempt interest income.[20]

Other situations where the exclusion from gross income of the economic benefit attendant with a low- or no-interest loan will result in disparate tax treatment are in those cases where a claimed deduction is limited by a percentage of adjusted gross income. For instance, most medical deductions under section 213 are limited to an amount which exceeds 3 percent of a taxpayer's adjusted gross income. If adjusted gross income is not increased by the economic benefit of an interest-free loan, the allowable medical deduction will be overstated. Conversely, in the case of an individual, the amount of allowable deductions for charitable contributions under section 170 cannot exceed a certain percentage of the taxpayer's adjusted gross income. In this instance, if adjusted gross income is not increased by virtue of a low-interest loan, the maximum allowable charitable deduction will be understated.[21]

In short, by excluding from gross income the clear economic benefit realized upon the receipt of a low- or no-interest loan to

---

[20]In addition to sec. 265(2), other sections which limit the deductibility of interest include: sec. 163(d) which limits the amount of interest deductible on indebtedness incurred to purchase or carry property held for investment; sec. 264(a)(2) which generally denies a deduction for interest on indebtedness used to purchase a single premium life insurance, endowment, or annuity contract; and sec. 267(a)(2) which disallows a deduction for certain unpaid interest in the case of related taxpayers. Furthermore, an interest deduction generally is unavailable to a person who choses not to itemize deductions.

[21]See, inter alia, sec. 219 (deduction for retirement savings); sec. 220 (deduction for retirement savings for certain married individuals); sec. 6012 (return filing requirements); sec. 6013(e) (innocent spouse provisions); and sec. 6501(e) (statute of limitations on assessment of taxes) all of which contain rules conditioned on the amount of a taxpayer's gross income.

a shareholder or employee, in *Dean* we properly sought to place such a transaction on a tax parity with interest-bearing loans accompanied by an increase in dividends and salary. It may be that in certain cases our solution of equating the two loan transactions, as demonstrated above, may result in a wide disparity in the tax treatment of the two situations. When and if we are confronted with such a case, we will decide at that time whether *Dean* is applicable, and if so, whether we shall continue to adhere to our decision in *Dean*. In the circumstances of the present case, however, whether or not we rest our conclusion on *Dean*, our decision of no deficiency would be the same. In other words, if petitioner were required to include as income the economic benefit associated with the loan, he would be deemed to have simultaneously paid an amount of interest equal to the income so reported. Under our facts, such interest would in turn have been fully deductible under section 163(a), the same as if it actually had been charged and paid.

Respondent, of course, disputes our conclusion in this regard. He asserts that petitioner was in full realization of the total economic benefit to be derived over the original 8-year term of the loan in 1967, the year the loan was first granted, and for the additional period over, which the loan was extended in 1969. Specifically, for 1967 and 1969, respondent increased petitioner's income by $701,211 and $1,536,156, respectively. In computing these amounts, respondent totaled the present value of the annual economic benefit, i.e., the difference between the 3-percent interest payable by petitioner and the interest which would be payable if a rate of 6 percent were charged, to be realized by petitioner over the term of the loan. In addition to his contention that petitioner has realized income, respondent argues petitioner is not entitled to any offsetting deduction under section 163(a) because he has not actually paid any interest. We cannot agree.

As support for his present value approach, respondent con-tends the amount determined thereunder represents what petitioner could have immediately realized had he subsequently entered into an arm's-length agreement allowing a third party the use of $4 million under the same repayment schedule on which he had agreed with Toolco. We think respondent's contention misses the point. Although we would agree if petitioner were to accelerate the realization process by selling

his rights under the loan agreement to a third party, the sale proceeds would be immediately subject to taxation; however, that is not what occurred. Rather, the economic benefit which respondent seeks to tax is the *use* of the funds in question at a preferential rate of interest. By its very nature, realization of this economic benefit occurs only during each taxable period in which the funds are actually used or available for use. This being so, we think it clear, any economic benefit which may flow from the favorable interest rate is realized ratably over the term of the loan.

With respect to respondent's contention that petitioner would not be entitled to an offsetting interest deduction under section 163(a), we recognize that as a general rule a cash basis taxpayer may not deduct interest unless such interest has actually been paid pursuant to a legal obligation. *Christensen v. Commissioner*, 40 T.C. 563, 577–578 (1963); *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 805–806 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962); *Howell Turpentine Co. v. Commissioner*, 6 T.C. 364 (1946), revd. on other grounds 162 F.2d 316 (5th Cir. 1947). However, none of the cases which have applied the general rule have dealt with the precise question of whether a taxpayer who must report as income the economic benefit associated with a low- or no-interest loan is entitled to claim an offsetting interest deduction. In such a case, we think an exception to the general rule of deductibility is both appropriate and necessary to give recognition to the economic realities of the transaction.

To begin with, as previously explained, a low- or no-interest loan is in substance identical to an interest-bearing loan accompanied by an increase in compensation in an amount sufficient to cover the interest. Thus, the transaction in the instant case is in substance the same as if Hughes had granted a loan of 6 percent to petitioner, paid petitioner cash for his services in an amount equal to 3 percent of the charged interest, which cash petitioner immediately repaid to Hughes in partial satisfaction of the 6-percent interest. In that case, petitioner would have compensation income *and* an offsetting interest deduction. Merely because the parties have eliminated the formalistic step of Hughes' paying petitioner cash equal to 3 percent of the interest, which petitioner would then repay to

Hughes, should not otherwise change the result. Indeed, in an analogous situation, respondent has admitted this to be the case.

In Rev. Rul. 73–13, 1973–1 C.B. 42, a corporate executive was provided personal financial advice from professional consultants engaged by his employer. The nature of the financial advice was such that had the executive actually paid for it himself, he would have been entitled to a deduction for such payment under section 212. In discussing the tax treatment of the transaction, the ruling concluded the executive had gross income consisting of compensation in kind equal to the value of the professional services received, and, at the same time, was entitled to an offsetting deduction under section 212. The deduction was permitted even though the executive neither "paid" nor incurred any financial counseling expense. Although the ruling offers little analysis, the result can be justified by reasoning that the transaction in question was in substance the same as if the corporation had increased the salary of its executive, which increase was used by the executive to purchase the financial advice. In such a case, consistent with the result in the ruling, the executive would have gross income *and* an offsetting deduction. A situation involving a no-interest loan as a form of compensation in kind is indistinguishable in principle. It is the same as an interest-bearing loan accompanied by an increase in compensation and should be treated accordingly. Hence, if a taxpayer, such as petitioner, is to be charged with gross income as respondent contends, he may be entitled, depending on the facts, to an offsetting deduction under section 163(a). In the present case, the parties do not dispute that if petitioner had in fact paid the additional interest in question to Hughes, such interest would have been fully deductible by petitioner. That being so, whether or not we base our decision on *Dean*, the result will be the same.[22]

*Decision will be entered for the petitioners.*

---

[22]Although we can certainly appreciate respondent's arguments to the effect that the decision in *Dean v. Commissioner*, 35 T.C. 1083 (1961), is laden with some potential for abuse, we think it

Reviewed by the Court.

QUEALY and HALL, *JJ.*, did not participate in the consideration or disposition of this case.

DRENNEN, *J.*, concurs in the result.

DAWSON, *J.*, concurring: Basically I agree with the rationale of the majority opinion. I think a nongift, no- or low-interest transfer of the use of the value of money between a lender and a borrower requires a realization of a taxable benefit by the borrower if the lender can, at the moment of transfer, reasonably expect to receive a quid pro quo in exchange. In the circumstances present here, I also think Mr. Greenspun is entitled to an offsetting deduction under section 163(a), notwithstanding the rather unequivocal language of that section.

I would go a step further than the majority and expressly overrule *Dean v. Commissioner*, 35 T.C. 1083, 1090 (1961), to the extent it holds that "an interest-free loan results in no taxable gain to the borrower." As I see it, this statement is too broad and the principle established in *Dean* is destined for ultimate reversal by the Courts of Appeals. Moreover, I doubt that many taxpayers have relied on this principle in *Dean* because it was a departure from prior law and the discussion of the issue was rather cryptic. It is indeed an unusual circumstance where a lender trusts an employee or shareholder with a large amount of money. It is even rarer to find a corporation or business that will place such assets beyond its use for a long period of time without receiving reasonable value in return for the use of such money. Most businesses are not liquid enough to make any, or many, interest-free or low-interest loans. The usual recipient is a highly paid, key employee or the owner of a closely held corporation.

---

important to point out that respondent has not aided his position by waiting approximately 13 years to publicly announce his disagreement with the decision. See 1973–2 C.B. 4, where the Service first announced its nonacquiescence.

While I usually respect the principle of stare decisis, I think we are free of its numbing effect here and we should not permit it to dictate our answer. See the rationale of the concurring opinion of Judge Opper (joined by three other judges) in *Dean v. Commissioner*, 35 T.C. at 1090–1091. A reversal now of this stated principle in *Dean* will not automatically designate all interest-free or low-interest loans as income producing transactions. In a nongift situation, each taxpayer will have an opportunity to prove that the loan was a product of skillful negotiation, a windfall, or something else that fits within our opinions in the *Husted, Pellar, Aspegren*, and *Hunley* cases cited on page 944 of the majority opinion.

FAY, SIMPSON, IRWIN, and CHABOT, *JJ.*, agree with this concurring opinion.

GOFFE, *J.*, concurring: I concur only in the result reached in the majority opinion. Even though *Dean v. Commissioner*, 35 T.C. 1083 (1961), has apparent disabilities, I conclude that it should be followed. We should decline to fashion a set of court-made rules in an area susceptible of and ripe for legislation, and we should not extend *Dean* by expressing views on the deduction side of petitioners' tax liabilities.

I agree with the majority that *Dean* should not be overruled and that its application to the facts herein requires a holding that petitioner realized no income from the low-interest loan. However, my agreement with the majority opinion does not extend to its gratuitous implication that petitioner would be entitled to a deduction for interest paid. That implication is unnecessary because the majority does not overrule *Dean*. To hold that petitioner paid additional interest to Toolco would be to push further the theoretical but not actual predicate of *Dean*. Such an extension portends further extensions. If petitioner is deemed to have paid additional interest to Toolco, as the majority seems to hold, then Toolco is deemed to have received additional interest income. Another taxpayer in a position similar to Toolco, because of the theoretical receipt of additional interest income, could lose its status as a small business corporation or could be deemed to be a personal holding company. This is not the occasion to introduce such uncertainties

into an area of law which is long established but which could be subject to legislative change.

To overrule *Dean* at this time would fly in the face of the actions Congress has taken with respect to regulations which the Treasury sought to adopt in 1975 to tax other fringe benefits. In 1975, the Treasury Department issued a discussion draft of proposed regulations which contained a number of proposed rules for changing prior administrative practice. The proposed rules treated some employee fringe benefits as taxable compensation. The discussion draft was withdrawn on December 28, 1976. Those in favor of withdrawal felt that the Commissioner's positions and practices in the fringe benefit area were of such long-standing duration that they carried the force of law. Consistent with that position is the fact that the Commissioner acquiesced in *Dean* for 12 years.[1] Then, in 1977, Congress began to review the tax treatment of fringe benefits. When it became pressed for time, it issued a moratorium on the issuance of new regulations in this area. That moratorium was later extended until 1980. A task force was created by the Committee on Ways and Means to study the fringe benefit area and make recommendations to the committee. The task force concluded that the area was so important and complex that it could only present a discussion draft bill covering general concepts, as a starting point for further consideration by the committee. The committee also requested recommendations from the Department of the Treasury. In light of this legislative activity in the fringe benefit area and the congressionally imposed moratorium on administrative changes of policy in the fringe benefit area, it would be inappropriate to overrule *Dean* at this time, as it deals with a form of employee or shareholder fringe benefit, the low- or no-interest loan. A very thin and ill-defined line separates judicial construction from "judicial legislation." Overruling *Dean* at this time would cross over the line into judicial legislation. In this case, we should heed the following words of the Supreme Court:

Courts properly have been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far-reaching consequences. When a principle of taxation requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily

---

[1] In the instant case, the parties struck their bargain before the Commissioner published his nonacquiescence in *Dean*. 1973-2 C.B. 4.

undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules lest they be subsequently overturned. Legislative enactments, on the other hand, although not always free from ambiguity, at least afford the taxpayers advance warning. [*United States v. Byrum,* 408 U.S. 125, 135 (1972).]

Also, to overrule *Dean* would conflict with what we pointed out in a Court-reviewed opinion only 2 years ago; i.e., the courts have uniformly rejected every attempt by the Internal Revenue Service to subject the making of non-interest-bearing loans to income or gift taxes. *Crown v. Commissioner,* 67 T.C. 1060, 1064 (1977), affd. 585 F.2d 234 (7th Cir. 1978). As we stated in the final paragraph of *Crown v. Commissioner, supra* at 1065: "Accordingly, if the scope of the gift tax is to be expanded to encompass such permissive use, we think it should come through congressional action, and not through unnecessarily broad judicial interpretation."

There are always going to be some economic benefits that flow between related parties which escape taxation. Drawing accounts of shareholders in closely held corporations are common. Usually, they are "flushed out" prior to the end of the taxable year by an offset against a bonus or by repayment. The Commissioner has, with mixed success, frequently determined that a corporation's advances to its shareholders were, in fact, dividends not loans. To hold that such advances result in receipt of income because no interest is charged goes more than one step further. If *Dean* were overruled, the Commissioner could charge a shareholder with dividend income during the year if the advances were repaid during the taxable year.

Another unanswered question would present itself if we overruled *Dean;* i.e., the timing of the benefit conferred upon the shareholder. If no interest or interest at a rate lower than a commercial rate is involved, the benefit is conferred at the time the deal is struck between the parties or the time at which the shareholder withdraws funds from the corporation. But interest is a charge paid for the use of money and can be allocated to the appropriate taxable years over the life of the loan to prevent a material distortion of income. *Sandor v. Commissioner,* 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976); *Resnik v. Commissioner,* 66 T.C. 74 (1976), affd. 555 F.2d 634 (7th Cir. 1977).

For the foregoing reasons, I agree with the majority that

*Dean* should not be overruled. As for the application of *Dean* to the instant case, it seems appropriate to point out a distinction between the facts present in *Dean* and those found herein. *Dean* did not involve compensation as does the instant case, but, instead, shareholder distributions from a closely held corporation. Compensation is taxable under the broad precepts of section 61 and the courts generally hold it taxable to the recipient if an employment relationship is found to exist. By contrast, the taxability of distributions to shareholders is based upon the more specific provisions of subchapter C.[2] Nevertheless, as the majority has correctly held, the principles of *Dean* mandate a decision that petitioner realized no income through his receipt of the low-interest loan.

TANNENWALD, STERRETT, and WILES, *JJ.*, agree with this concurring opinion.

NIMS, *J.*, dissenting: The majority's reluctance to reverse the long-standing holding in *Dean v. Commissioner*, 35 T.C. 1083, is understandable. We decided the *Dean* case in 1961, and the Commissioner acquiesced de facto for 12 years. Nonacquiescence was ultimately announced in 1973 (1973–2 C.B. 4).

Nonetheless, we have the duty of deciding the case before us on the basis of the facts presented. It is undisputed that in the transaction at hand, the petitioner realized a substantial, well-defined, ongoing economic benefit, namely, the use of $4 million at 3-percent interest at a time when the parties have agreed the available rate from an outside lender would have been 6 percent. As a matter of fact, the 3-percent rate was provided only because of Hughes' and Toolco's apprehension that the Internal Revenue Service would react unfavorably to an interest-free loan.

The majority opinion, following the *Dean* rationale, in effect provides petitioner a constructive interest deduction with which to offset the conceded income. If this approach is pursued, the Court may expect to be eventually confronted with a case in which the Commissioner asserts imputed interest income to the lender—a quid pro quo for the constructive deduction allowed

---

[2]Also, note that Congress has specifically legislated by imputing interest between parties in certain deferred payment contracts. Sec. 483, I.R.C. 1954.

the borrower. One can easily visualize this occurring, for example, in the stockholder-controlled corporation context.

While I could not support respondent's "present value" approach in determining the asserted deficiencies, I would hold that petitioner is taxable under section 61(a) on the value of the use of the unpaid loan balances during the years in question, measured by the difference between the 3-percent interest actually paid and the 6-percent going rate.